The court will hear argument in the case of Gorman v. Cantu. Mr. Gorman, whenever you're ready. Good morning, Your Honor. I'm Thomas Gorman. I'm the appellant. I was appointed trustee in the bankruptcy from which this appeal arises. Thank you very much. Your Honor, my argument is that I'm asking the court to reverse the decision of the bankruptcy court as summarily affirmed by the U.S. District Court confirming this debtor's second proposed plan. My appeal is based on two separate issues, and I'd like to deal with the first one. I believe the bankruptcy court erred in two regards. Once in approving a plan which had as its budget item a deduction for support of $1,625 when the court ordered support was only $1,500. This issue isn't as intellectually sexy as the separate issue about the retirement account, but it's an important issue, and I think it's a clear and easy one to get one's arms around. The statute says you get to deduct court-ordered support. Line 19 of the means test says court-ordered. The debtor put down $1,625 a month as his court-ordered support. After inquiry on my part and request of documents, it turned out that the court order only had $1,500 a month. So right away that raises good faith issues that I hope to have time to back to at the end. But for purpose of this argument, this plan failed right then and there. The statute says court order. The order said $1,500. The court order, by the way, was entered a mere 10 days before the petition was filed. This was not some ancient order that had perhaps been overtaken by time and events. It was a fresh order right before the bankruptcy. And the bankruptcy court found that this was sort of a Scribner's error, that they mixed up monthly, twice monthly versus biweekly, which I always do. That was part of the court's rationale, that it was a Scribner's error. And also that it was somehow convened because of the number of paychecks. And he also ruled- The court order was based on a subsequent marital settlement agreement dated July 24th, 2015. It was incorporated into the divorce order, not the one that Atbelly is talking about. Where is this July 24th, 2015 marital settlement agreement, anywhere in the record? No. I referenced that in a footnote. But it was undisputed that the order and the pleadings of record were $1,500. That was never the court order. The document incorporated was $1,500. And the court said it was Scribner's error. The court also said it was the intent of the parties that it be the $1,625, even though the testimony was that the parties agreed to that subsequent to the entry of the order. So I think the bankruptcy court missed it timing-wise. It's also important- So you're saying that there's no evidence in the record that the debtor in this case was actually making payments? No, no. His testimony, which went unrefuted, was that at some point in time he and the wife agreed it would be that amount. It was more convenient because of the paychecks. But it was subsequent to the entry of the order. The bankruptcy court, I think part of their error, and there were many bankruptcy court errors, said that the order failed to reflect the intention of the parties that it be $1,625. And that was the Scribner's error. And I want to make sure I get this out to the court if I only say one thing. The debtor's testimony is in the transcript. When I asked him was after the order, he and the wife had a discussion. He knew he was filing bankruptcy and would no longer have his creditor payments to make, so he figured he could afford to pay more. So she and he agreed to this extra amount. So it wasn't a Scribner's error. His testimony was it was something they decided to do afterwards in contemplation of bankruptcy. So the bankruptcy, so what you want us to say is that the bankruptcy judge, that that made a clearly erroneous fact. Yes, sir. Yes, ma'am. But I'm also, I'm not even sure. It's axiomatic black-letter law that parties can't orally modify state court support orders. The bankruptcy judge conceded that. He got around that intellectually by saying, well, that always comes up in the context of enforcement proceedings. One spouse is enforcing an obligation. The other person's defense says we orally modified it. Bankruptcy judge, that wasn't likely to happen here. He was paying more. Therefore, she wasn't likely to enforce it. That may be true as a practical matter, but that's not the standard. Number one, court speaks through its orders. The order said $1,500. Number two, there's 100 years of Virginia jurisprudence that says parties, but it's a statute. Parties can't modify. It can only be modified by the court. That wasn't done here. And number three, the divorce decree incorporated July 24th, 2015, marital settlement agreement, which was subsequent to the June 5th separation agreement that Appellee hangs his argument on. But the form is somewhat mechanical. The court ordered support. The court order said $1,500. We did intellectual backflips to get to, well, 1625 is okay. That wasn't what the court order was. It was clear error on the face of it. It's clear error in not taking into account the evidence that the debtor said he did this in contemplation of bankruptcy, knowing he'd have additional income freed up. The debtor's not without remedy in these situations. Parties can and frequently do go out to modify. If it was Scrivener's error, which I don't think it was. I think that was gyrations intellectually. But if it was Scrivener's error, they can go and correct it. There was ample time between when I raised the issue in connection with the first plan and when we had the hearing, it could have gone out to state court and sought a modification. But this bankruptcy court took it upon itself to reform a state court order. Again, it violated Virginia jurisprudence. I understand a lot of what you're saying, but I guess I don't see how they reform the state court agreement. All the bankruptcy judge can do is figure out what number you can put down on that line in your bankruptcy form. I don't see how that changes the Virginia agreement. Maybe we're talking semantics, but what the judge said, he said Scrivener's error, the intent of the parties was 1625, that's the number we're using. That doesn't change the Virginia divorce decree. Not if one looks at the record. But hypothetically, if down the road something happens and the recipient comes in and says, you're not paying my support, it's 1625. She's got testimony of this debtor coupled with a federal court finding that 1625 was the intent of the party and this was a Scrivener's error. And then in Virginia, the other party will say, so what? It didn't reform the divorce decree. It's stuck. I've got this binding decree and you get 1500. And you're right, and I'm saying not. But this seemed to be a big part of your legal argument in your brief, so that's why I'm kind of harping on that. Well, my argument is the judge didn't have the right to do what he did. Whether you call it reformation or just interpreting it, calling it a Scrivener's error, the order said what it said. It wasn't sufficient evidence to reach the conclusion. In fact, the evidence was the debtor saying I decided to do it because I had the extra money. The money's either going to go to the creditors, go to the spouse. He chose to have it go to the spouse based on his testimony. But the statute and the form don't allow you to do that. They don't say what you're paying. In reality, it says what the court ordered. It's an objective standard court order. The court order here, 1500. Nobody disputes that. The trial court erred in ruling that the appropriate number was 1625. If I can move on to the other topic, the retirement account issue. I believe the trial court erred there. I don't want to rehash my brief. There are, when you look at the case. Actually, can I ask you just to rehash one part of it? I didn't understand what your position is on the post-petition retirement plan contributions. It seems like at one point you were arguing for this kind of middle ground thing. You can exclude post-petition contributions so long as you were also making them pre-petition. At other points, it sounds like you're saying you can't exclude any of them. And then in your reply brief, you forget all about that and just say no good faith. So what exactly is your position? There was no good faith, and the good faith is a separate issue. If I might deal with that right now while I'm thinking about it. Good faith permeates 13. Two levels. If the case isn't filed in good faith, the court can dismiss it under 1307. Independently in confirming a plan, and that's the one here, 1325. The court has to find the plan is filed in good faith. All the cases, whether you look at Johnson, Seaford, Prigge, his progeny, they all say whatever test they use, subject to good faith. They kind of blow by it. Good faith is everywhere. And that's where I come out on this. For whatever reason, the court seemed pigeonholed to these three tests. Like this is let's make a deal and we only have three doors. I think the way you reconcile the statute is with the two statutes, 541 and 1325, is the overriding good faith requirement. So what you want us to hold is whatever the right standard is, it does involve good faith, and the district court clearly erred when he found that this proposed exclusion was in good faith. Yes, you're somewhat on it. I don't think the three standards are the only standards. The first place that Johnson, the one the court adopted, is pre-Lanning, pre-this court's ruling in Quigley. Lanning taught us that disposable income, that's what's in 1325B2. Disposable income is not included in property of the state, in the thing under 541. But Lanning taught us that sets the bar. We then look at any changes post-petition. This court accepted that in Quigley, which I think is really the binding authority. Quigley, you start with what you have to look at changes. In this case, the change was the retirement account was going to drop off. Apparently it turned out it dropped off sooner than was disclosed. But the retirement account was going to drop off. That's a known change. Lanning teaches us you start and then you look at known changes. Johnson precedes Lanning. But Johnson seems to say, at least the way this court interpreted it, you can put whatever you want in retirement, Katie, bar the door, subject to a good faith limit. The one or the other at Spring-Quigley says no, no retirement, everything for creditors. Seifert uses this. Well, we look at what was being contributed. That seems to be the most middle approach. But I don't personally think Seifert is exactly right. It's close. I think what the debtor was doing pre-filing is one standard, one factor the court can look into in whether the debtor is proceeding in good faith. If you have, for example, a 60-year-old debtor who couldn't contribute to the retirement account because he was being garnished on student loans guaranteed for children and the bills were medical bills, the totality of the circumstances, that debtor putting some money away to retirement at age 60 might mitigate one way under the totality of the circumstances looking at the debtor's good faith. Conversely, a 29-year-old debtor who had all credit card bills the rest of his professional life to restore his retirement plan, credit card bills, a deficiency on a sports car, there him putting $400 or $500 away in retirement at age 29 may not seem such good faith. Can I? I'm sorry. This is the last time you're going to ask this question. So what you want us to hold is not that the district court asked the wrong question but that the district court got the wrong answer. When the district court found that this proposed exclusion was in good faith, that's where the district court went wrong. It's bankruptcy court. Bankruptcy court, yes. But, yes, it got it wrong and it also, by adopting Johnson wholesale, by saying that, well, you can put in whatever you want, it adopted. The court said Johnson says you can go ahead and make changes post-petition and it's excluded from disposable income at the outset. So, therefore, what you do with the late... If it's in good faith. Well, good faith, it's an overlap. But, yes, if you want to label it good faith, that's fine. But I'm not saying it's absolutist. You can't put retirement money away post-13. Why not? I mean, why doesn't the absolute view apply in this case? It seems to me that if the statute that the Congress was very explicit in authorizing loan payments with respect to retirement plans to be excluded from disposable income but said nothing about post-payments with respect to the retirement plan. So, they spoke clearly when they wanted to. They said nothing about this. Why isn't the answer what the Sixth Circuit said? You're not allowed to contribute. Well, and I'm arguing the debtor's side here. We have to give some deference to that hanging paragraph in 541. What do you think that means? I think it only uses the words disposable income, which is the language in 1325b-2. I think it says, and this is where Seifert was coming down, you set the bar at the petition date. Your disposable income is what you were doing then. If you were having retirement loan repayments or voluntary contributions, there it's alluded. But 1325b-1b uses the phrase projected disposable income, which, as this Court's taught us in Quigley, projected disposable income is different than disposable. Projected includes the changes that come along the way. The hanging paragraph in 541 doesn't refer to projected. It's consistent with Lanning. We set the bar based on the petition date. But I don't think Quigley is right when it says that's the end of it. I guess the problem I'm having, you seem to be suggesting a test that punishes the debtor depending on his attention to his finances. No, then I've done a poor job of articulating myself. I thought the example you gave was one debtor who couldn't contribute to a plan, to a retirement plan, even though he or she wanted to in good faith, and the spendthrift creditor who maxed out his credit card shouldn't be allowed to contribute. Part of what I was doing in my examples was the difference in age. At bankruptcy courts looking at equity, and part of the factors is the fresh start of the debtor, a 60-year-old debtor, whether they should be allowed to make voluntary contributions. Where do you draw the line? How old is old? Well, first place, under the statute, it only comes up if a trustee or party in interest objects. So it's not something the court has to look at. And then when somebody raises it, the court does its job and looks at the evidence and makes findings. Where is the debtor in life? And in this case, we had a 38-year-old debtor with another retirement vehicle. He was having mandatory retirement deductions taken out. I think those are different. Judge Diaz asked where you draw the line and how old is old. I don't know. There's other factors. Health. I mean, if you've got a 42-year-old debtor who is not able to work full-time because of health reasons or other reasons, and that's where I think Priggey goes wrong. Priggey says nothing, and Seifert, which I think has probably got it closest, Seifert makes it what you were doing at the date of the petition, you're frozen in time. That gives advantage to the debtor who maybe was more successful avoiding creditors and was able to pay retirement money. It punishes below-median debtors. I think the court has to look, if a debtor says I want to make voluntary contributions or I want to change my voluntary contributions, enhance my retirement account, as this debtor did, the court looks at it and makes a factual determination under good faith. But the court did that here. This is why I'm just confused at what exactly it is you want us to hold. The court did that here. Yes, and the court erred. The court erred. Erred in finding good faith. Yes. That's what you want to say. Yes, and let me give you the factors that I would point to. First place, the debtor didn't have this epiphany about putting the retirement money in until after I had objected to the first plan. Confirmation was denied. His decision to contribute this money going forward was completely responsive to my objection. The problem was that he paid off a loan and so more money was available. Right, but in his first plan, he didn't propose to make the retirement contributions when the loan paid off. I raised an objection saying when that pays off, it needs to come in. Then he filed a second plan that then said I want to start contributing. Hadn't he been contributing for many years before and then he had to stop? Right, he had to stop. So doesn't that sort of indicate good faith? I'm sorry? I mean that sort of speaks to good faith. It does in fact. It's not like for the very first time he decides, oh, I should start thinking about my retirement. Yes, but he decided for the very time he didn't decide until partway through the bankruptcy. After I raised the issue, he then came back. He gerrymandered the budget to come with the same result number and to get there, he said now I'm deciding to start contributing this. The first plan, unlike the supplemental case that Pelley added, the first plan they didn't decide pre-petition we're going to make this change. He decided post-bankruptcy in response to my objection. He realized I'm going to have to pay it to my creditors. So then he changed his course and says nope, when the retirement loan pays off, I'm going to divert that to augment my retirement account. That's not a good faith factor. The 38-year-old age, he had other retirement monies coming out all that time, not a lot but some. He had $20,000 in his retirement account in an IRA he testified to. It wasn't the slows in his bankruptcy on Schedule B. That's not a good faith factor. That came out at the hearing. I've raised that in my pleading. Yes, good faith is an issue for trial courts. Normally deference is given to the trial court, but in this court, given the court's ruling on the support issue and what it did here, I don't think that the court, I think this is the rare instance where the court clearly erred in finding good faith. I think it applied the wrong standard and I think it misapplied the standard on the retirement account. Thank you. Good morning. Good morning, Your Honors. May it please the court, David Cuny for the appellee, Mr. Ricardo Cantu. This is Janet Boyd who is with me this morning. She represented Mr. Cantu in the pleadings below. This case obviously involves two very important issues. One is a very complicated interpretation of 541B7 and the other is the factual issue dealing with good faith and the determination of the domestic support decree. I would propose, unless the court feels otherwise, I'd like to address the legal issue first. It's of extreme importance to Mr. Cantu, but there are tens of thousands of our Chapter 13 debtors who I believe are going to be looking to this court to help resolve some of the tension that's growing up among the circuits. I'm a little bit concerned about how squarely the issue is presented to us, given that your colleague's position appears to be limited to the bankruptcy court got it wrong in finding good faith. Well, if that's his position, Your Honor, then I think we have a fairly erroneous standard. I think the court should affirm. I'm happy to go over. I think my colleague has somewhat misstated what the record shows on the good faith. I'm happy to go through the good faith issue first. No, I'm not asking you that. I'm just trying to get my hands around whether we in fact have a big legal question in front of us at all, given the way the parties are arguing the case. Judge Kennedy did, in fact, rule on good faith. He looked at the fact that he had been making payments for 11 years, judged his demeanor, and did not find that he had tried to manipulate the code or had done anything improper. I think he found that. Before you get to that, let me just back up. Do you agree that the good faith test is the standard in this case? In part, okay. There's a statutory test that talks about the ability that excludes voluntary contributions to a pension plan being included in disposable income. You have to, A, meet that test. That exclusion has to be applied. Then, on top of that, the courts hold there's an independent good faith requirement. So it wouldn't be impossible to have facial compliance with the statute and fail the good faith test. But that didn't happen here. There are some courts that have held that the exclusion, statutory exclusion, 541B7, preempts the good faith test. But I don't think we have to reach that, and I don't think Judge Kennedy said that, and I'm not urging that the court go in that direction. I think the good faith overlay addresses the legitimate concerns that people don't use 541B7 improperly. And I think the lower court properly found that Mr. Cantu did act in good faith. So, again, I'm happy to address. I'd like to address the legal issue because I heard Your Honor mention Seaford. Yeah, so I do want you to talk about that. It seemed like the Sixth Circuit just took a straightforward statutory language view of this case and found Congress spoke very clearly when it came to loan repayments and exclusion of those repayments from disposable income, but said nothing about what you're espousing here. And it seems like a really roundabout way to get to where you want us to go. Your Honor, I respectfully think otherwise. Let me tell you why. You have to look at the legislative history in Patterson v. Shumate. So it really goes back to 1992. The Supreme Court decided in 1992 that ERISA accounts were excluded from property of the estate. And that was sort of seen as a protective measure for retirement accounts. What happened following that was the Sixth Circuit, in this case called Harshbarger, said despite what the Supreme Court had done in Patterson v. Shumate, contributions to a retirement plan and loan repayments, both, were not protected by the Patterson Doctrine. That was in 1995. So in reaction to Harshbarger, and many of the courts have picked up on this, in reaction to that severe holding, PAP-CEPA deliberately excluded both. In 1322, they carved out the loan repayments. They didn't need to repeat it in the property of the estate section because they had just said the same thing. If you look at the language, the 1322-F language and the 541-B-7 language, they're almost identical. They're adopted at the same time. They're in reaction to the harshness of Harshbarger, well-named, I might add, and I think clearly intended by Congress to provide additional protection for debtors. What is the express language that you say that excludes contributions as opposed to – I mean, the loan repayments section is very clear, but I'm not so sure about the other half. All right. Fair enough. Look, the way I – 541-B-7 says, such amount under this subparagraph shall not constitute disposable income as defined in 1325. So you have to ask yourself, what's the antecedent to the such amount? And it refers to a subparagraph, which in the Bankruptcy Code would mean Part A and Part B, which are the contributions. And the contributions are excluded from property of the estate with the predicate of the preceding phrase being any amount. So the way the courts have interpreted it, they said, look, the any amount means any time. It takes out the temporal limitation. So if we exclude from property of the estate any amount, and that refers to contributions plural, and then the next section says such amount, referring back to any contributions, are not – shall not constitute disposable income, you've got your textual clues. You've got your textual explication as to how all this works. So what has happened, you know, BAPSIPA was in 2005 and the Johnson case was in 2006, and for a few years all the courts agreed. There was no dispute. The Johnson case said quite clearly 541-B-7 takes voluntary contributions outside of Chapter 13, and that was the accepted rule. Then you had Prigge come along and Seifert, which, you know, Prigge actually was a regressive decision that took us right back to where we were before Patterson v. Schumann and was very regressive and said no contributions and no loans. And Seifert at the BAP came up with initially this middle ground, which if you think about it, as well some contributions are excluded depending on your economic condition on the day of your petition, which is, you know, the least statutorily precise outcome. And then they adopted the Prigge view. The Prigge view was what Congress meant was only the money that the employer has in its hands is excluded. Well, Congress didn't need to do that. Patterson v. Schumann had done that already. The risk of funds are excluded from property of the estate under 541-C-2. So Congress had to fix a specific problem that arose in a specific case. It was the Harshbarger case. Mrs. Harshbarger walked into that Ohio court, tried to start making contributions. Actually, she wanted to repay. Let me, if we, then why wouldn't Congress have similarly included the exclusion for contributions in 1322? Your Honor, a lot of courts have raised that question. And the answer that most of the courts give is they didn't need to. Look, Congress is less than ideal from time to time. I think the suggestion that a lot of courts have asked that question presents a problem. But they've answered it. And the answer, and I think it's the correct answer, is these were both drafted at the same time. Well, you say they've answered. The Sixth Circuit obviously came to a different view. Other than the Sixth Circuit, all the other courts, the bankruptcy courts and ten other circuits have said, look, 1322 and 541 are drafted at the same time. They're both part of that CIPA. 541 is property of the estate. 1322 are some exclusion. So the loan repayments, they never were going to be property of the estate. That exclusion should never have gone in 541, and so it didn't. But when it came to address the Harshbarger problem, that more properly belonged in 541. And in any event, it would have been redundant. I mean, we can ask, why didn't Congress put them both together? But they did adopt them at the same time. They did use similar language. And one carries a little more weight because the exclusion in 541 has two purposes. You've got to address the best interest test, which is a liquidation analysis, not just a disposable income analysis. So there's a reason to have the exclusion in the property of the estate section that wouldn't apply to loan repayments. So I think the draftsmen may have had in mind we need to do more for the ongoing contributions than we do for the loan. I think it's logical. It's not perfect. But other than the Sixth Circuit, all the other courts that have addressed it, and I believe properly so, have seen this as no need to have replicated that same sentence in 1322. It's perfectly fine where it is, and it has almost the exact same language. Let me spend a few minutes on the bad faith, if I might, unless I don't need to. But I think I'm happy to go over some of the findings there. Are you talking now about bad faith? But the domestic relation. I think, well, let me ask you a factual question. Is the summary of your client's testimony accurate that Mr. Gorman provided? No. And the record here is less than perfect. There's nothing I can do. I'm an appellate attorney. I have records handed to me. But there are some things that are very important to understand. I'd like to go through them because, A, I don't believe the bankruptcy court for a moment exceeded its authority. And I think Judge Harris is correct. There was no modification of a state court decree here. This was the everyday work of a bankruptcy judge. A divorce decree in bankruptcy law is defined as a debt. And the everyday work of a bankruptcy court is to calculate the amount that is due under a debt. It's no different than any other debt. And so to say that a bankruptcy court under 1334, it's granted jurisdiction, doesn't have the power to determine the amount of a debt is quite unusual and is incorrect. But how did the bankruptcy court determine that this was a scrivener's error when the divorce decree adopted the July 24, 2015 marital settlement agreement? Let me answer that. I want to go through, if I can, carefully the chronology here because I think it does answer that question. So here I've got the appendix reference. The Cantus are married in 2012, appendix 201. They separate in 2014, a very short marriage. He's initially paying her $300 a month, so he testifies. On June 5th, they sign the separation agreement. That's appendix 215. That's the one that has 550 for child care and 200 for spousal support. Those are the numbers that Mr. Cantu always used throughout his bankruptcy proceeding. Now, it's in the appendix. It was in the appendix for the district court. It's in the appendix for this court. It did not get put into the record by the bankruptcy court. But Mr. Gorman has acknowledged that he was, in fact,  But it also didn't, it wasn't part of the divorce decree. A subsequent separation agreement was what was incorporated in the divorce decree. So I don't understand how the bankruptcy court could call that a scrivener's error. Well, because it was. Let me explain why. So let me go through the chronology. So the Cantus have an agreement before they go into court. That's the separation agreement. Then they go into court, and they apparently present a document that says we're paying $750 every pay period, and it gets put down as $1,500 per month. They don't put that down. They testify that the court put it down. So it's an understandable mistake, except that it's wrong. What's this July 24th, 2015 marital settlement agreement? What does it say? The one that's incorporated into the divorce decree. I understand what the difference is. They both have the same mistake, but the reason we know it's a mistake and not an invention is because when asked where he got those numbers from, he sent to Mr. Gorman the separation agreement that he had been living by, which had the correct numbers, and the judge credited that. And no one has disputed it. Look, there is no factual dispute. I put that document in the record for a reason. I told Mr. Gorman, this is what the parties had agreed to before they signed any court document. And I wanted to tease out if anybody thought that factual assertion was wrong, and they didn't. Well, that's my problem. That was what they agreed to before, but it appears that that agreement changed. Pardon? I didn't mean to interrupt. Did the agreement change or not? No. Mr. Gorman has persisted in presenting this case. Then why doesn't the divorce decree incorporate the June 5th, 2015 document and not this new July 24th? I think it probably should have, but I don't think it matters legally. It probably should have. I want to separate two different issues here. What did the parties agree to? Not a legal issue. Just was there a good-faith agreement, was it well-documented, and then did the two subsequent court proceedings pick a different number? They did. That's the historical record. They had one number in mind, I'm going to pay my wife $750 every two weeks, and someone in the Fairfax court wrote $1,500 a month. Not them. So there is a mistake. That's a historical fact. Then the legal question is, when a bankruptcy judge has in front of him a court decree and he's satisfied that there's a historical mistake. Was the July 24th, 2015 document that the divorce decree incorporated, was it in the record? Yes. Where is it? I haven't. It's at Appendix 207. I don't, but it's not part of the bankruptcy record. The bankruptcy court didn't see. I think the bankruptcy court just had the divorce decree. Right, and not the document that the divorce decree was based on. Not the prior one. Remember, there's three documents in this confusing case. There's a property settlement agreement, there's the divorce decree, and then there's the intermediate one that Your Honor just referred to. So all the bankruptcy court has is number three. So now you have to ask yourself the legal question. Before you get to the legal question, I don't know that you ever answered the question about the additional information that Mr. Gorman said the bankruptcy court had, and that is your client's testimony that he changed the amount of the payments right before filing. Because he didn't, Your Honor. Because that's untrue. Okay. It's just factually improper and untrue. That's the reason. The reason I sent Mr. Gorman the June 2015 agreement, because I wanted the U.S. trustees all to know. There's nothing in the record that supports that claim. There's a confusing piece of testimony. Remember, the parties have a lower number at first, 300. They do raise it. They raise it to the amount shown in the property settlement agreement. That's accurate. Where I think Mr. Gorman is confused, he wants this court to think that they raised it on the eve of bankruptcy. That is untrue. They had a written signed agreement, it's in the appendix, where the amounts that he put down on his bankruptcy schedule are exactly what he was paying and exactly what they had agreed to in writing. And why somebody in the Fairfax Circuit Court put down a different number, I don't know, except they sound similar. It's kind of an understandable mistake. But it was wrong. And there was no conniving. There was nothing done wrong. When the parties changed their mind, the numbers that we're controlling were in June of 2015. They filed for bankruptcy in December of 2015. I'm not sure. I don't know how we can know it was wrong or how the bankruptcy court could have known it was wrong without looking at the July 24, 2015 agreement that was subsequent to the one you're talking about. Subsequent agreements control. Your Honor, here's what I think controls. If you ask yourself, what authority did the bankruptcy court have to review a state court decree, the answer is the same power that the Fairfax County Circuit Court would have. And the law in the state of Virginia, unlike what the U.S. trustee has said, is that the court's obligation in reviewing a decree is to interpret the party's intent. That's the standard used. How can they do that without looking at the party's settlement agreement that the divorce decree incorporated? Your Honor, I think they can look at anything. It's parole evidence otherwise. And there's no prohibition against that. There's nothing in the Virginia Code that says that a circuit court judge in determining party's intent to a contract can't consider any evidence, parole evidence, written evidence. So the question is that this judge look at something that a Virginia court judge couldn't. I say no. He heard testimony and he believed it. And it's true. I mean, the reason I insisted on having this document in the record, I wanted this court to know that. Which document? The June 5th document? Yes. I wanted this court to know that what Mr. Cantu has said was 100 percent truthful. And what he put down in his schedules was 100 percent truthful. I would really know that if I could see the July 24th, 2015 document and understand that it is consistent with the June 5th document. I don't want to guess. I'm not going to guess. I'm going to have to leave it unanswered. I'm sorry. All right. Are there any other specific questions on this? I think I'm going to leave it at that unless the court has other questions. Okay. Thank you very much. Thank you, Judge. First, there was an assertion that the testimony I referred to may not have occurred, so I want to give you the specific site. It's in the appendix, page 169. It's the transcript of Mr. Cantu's direct testimony at the May 2016 hearing. He said, quote, as time went on, dot, dot, dot, I figured that I was going to be probably going through bankruptcy and I wasn't sending the money to my creditors so I could afford to pay more child support. That's the specific testimony I was referring to that was before the trial court. Secondly, there was a lot of discussion about what the parties intended. Unfortunately, the statute in the form he filled out says court ordered, and this gentleman under oath said the court had ordered 1625. In fact, the court hadn't. So I think we can dispense with that. And the one thing I probably will be unsuccessful, but I'm going to try, I want to clarify perhaps what the court interpreted in my position. I don't see this as exclusive on the retirement, just a good faith analysis. That's part of it. I was responding to what I thought was the court's inquiry of which of the three tests, and I was trying to explain how I reconcile. There is a conflict between 541 and 1325, and I think that the good faith sort of allows us to reconcile it. I believe Seifert gets it best, but I don't like the what's before is the Bible. I will note. You say Seifert. You're talking about Seifert, the back opinion, not the Sixth Circuit view of things? The Sixth Circuit, which the bankruptcy court judge ignored the Sixth Circuit opinion. The Sixth Circuit affirmed it with some small changes. Well, I thought the Sixth Circuit took the absolutist view that it wasn't in the statute. It's not part of the supposedly. That would be one way of looking at it. Well, what's your way of looking at it? Yes, they did, and Priddy takes the absolutist view. And our judge here took the Johnson view. Again, pre-Lanning, I want to respond to something Your Honor asked before. Every circuit court that has examined this issue has found the other way, has found that when your retirement loan pays off, it gets added to your plan payment. That's Newland, which is the Fifth Circuit, Lasowski, which is the Eighth Circuit. Those are all cases where the debtor came in and said, I'm going to put that money, I'm going to make that money a voluntary post-petition contribution. No, that would be Seifert. That seems like that's the question. Everyone gets that if the loan gets paid off and the money isn't otherwise excludable from disposable income, it goes into disposable income, but that's not this question. Well, but yes, it is. How do you exclude it? You divert it somewhere else. Can I ask a question? Because this is the thing that I just have trouble with as a matter of common sense, but I'm guessing maybe you can explain this to me. So I don't understand why Congress would want to distinguish between pre-petition and post-petition voluntary contributions. Tell me what I'm getting wrong. It seems to me like Congress has to make a judgment, right? Either you let debtors save for their own retirement at the expense of their creditors or you don't. But one way or another, why does it matter whether they're saving before they file the petition or after they file the petition? If you think they shouldn't be able to do that, then the creditors ought to be able to claw back and get what's already in their retirement accounts as well as what otherwise would be post-petition contributions. Why draw the line there? Well, Seifert says you have to draw the line somewhere. That's as good a point as any, and they also point to 541. But I'm saying why does that make sense? It doesn't to me, and that's why I confused the court earlier. But even just Seifert, I also mean on the very strict view. Why would Congress have wanted to treat those two kinds of contributions to retirement funds differently? Either the creditors get the money or the debtors get to save for their retirement. Who cares? Why would Congress be focused on whether the debtor is saving before he or she files or after? I don't think they were. Okay, well, then that means that the strict view is wrong because we know you can't claw back and get the money once it's already in the account, right? Yes, and nobody's saying that here. Right, and so if that's true and there's no reason why Congress would have cared whether you've already made the contribution or whether you're making it after you petition, then I guess you also get to do it after you. I maybe misunderstood your question. Are you talking about clawing back and getting monies paid pre-petition? I'm just saying why? Why the decision? Because 541 fits as the petition date, and that's what Seifert said. But 1306, which gets ignored in this. I'm not even asking you about the text. I just think maybe someone could explain this to me, but maybe not. Why Congress would have cared. Why Congress would have made a judgment. Debtors may save for their own retirement at the expense of their creditors instead of paying back their bills, but only until the day they file for bankruptcy. After that, they can't. Tell me what the policy judgment is that would animate that rule. I don't think that's the rule. But Congress did say the petition date is the starting point. That's 541. That's where the handing paragraph is. 1306 says in 13s and 13s only, your post-petition income comes in. So that's what makes 13s different. 711, your post-petition income is yours to keep. 1306 says it comes in. Then the question is what can you do with it? Your reasonable necessary expenses. These cases in this case are can you instead of paying your creditors on your post-petition income when your retirement loan pays off, divert it to further retirement rather than adding it to the pot to the creditors. So the petition has to be the starting point. 541 starts there. 1306 augments it. I don't think Congress said whatever number you were magically putting in, whatever the withholding was on your petition date, that's your withholding going forward. CFER would suggest that. I don't accept that. I think CFER gets it closest to right. I don't think this court is bound by it. But as I said, I don't think we're limited to just those three tests. I think it's somewhere in there. It's CFER modified. Thank you, Mr. Warner. Thank you. All right. We'll come down and greet counsel and proceed to our next case.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris